UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

American Mortgage & Equity Consultants, Inc.,

         Plaintiff,

v.

Everett Financial, Inc., d/b/a Supreme Lending,

         Defendant.

File No. 20-cv-426 (ECT/KMM)

**OPINION AND ORDER**

---

Ari Karen, Offit Kurman, Fulton, MD; Sarah A. Kleinman, Offit Kurman, Philadelphia, PA; Glen E. Schumann and John P. Boyle, Moss & Barnett, PA, Minneapolis, MN, for Plaintiff American Mortgage & Equity Consultants, Inc.

F. Matthew Ralph, Briana Al Taqatqa, and Michael A. Lindsay, Dorsey & Whitney LLP, Minneapolis, MN, for Defendant Everett Financial, Inc, d/b/a Supreme Lending.

---

In this breach-of-contract suit between competitors in the mortgage lending industry, Plaintiff American Mortgage & Equity Consultants ("AMEC") seeks a preliminary injunction forbidding Defendant Supreme Lending from recruiting AMEC employees. AMEC claims that Supreme Lending's recruiting activities violate a binding letter of intent executed as part of failed negotiations over Supreme Lending's possible acquisition of AMEC. AMEC's motion will be denied because the law and facts do not show at this preliminary stage that AMEC is likely to prevail on the merits or to suffer irreparable harm.

# I

The Parties' negotiations began in June 2019. That month, AMEC's chief executive officer, Todd Ellestad, and Supreme Lending's president, Scott Everett, discussed Supreme Lending's acquisition of AMEC. *See* Everett Decl. ¶¶ 1–3 [ECF No. 34]. The two quickly agreed on basic terms of the acquisition, and Everett then asked Supreme Lending's chief operating officer and chief legal counsel, Jeff Joyce, to prepare the deal papers and negotiate remaining details. *Id.* ¶ 4; Joyce Decl. ¶ 3 [ECF No. 38].

Joyce and Ellestad began by negotiating a letter of intent pursuant to which AMEC and Supreme Lending would "agree[] to negotiate and enter into an Asset Purchase Agreement and related transaction agreements." Ellestad Decl. ¶ 4 [ECF No. 16]. On June 21, 2019, Joyce emailed a first draft of the letter of intent (or "LOI") to Ellestad. Joyce Decl., Ex. 4 [ECF No. 38-10]. Among other things, this first draft provided: "This LOI must be accepted and a signed copy returned to [Supreme Lending] . . . within ten (10) days of the date of this LOI[.]" *Id.* § 11. Ellestad did not sign and return the first draft, so on July 25, Joyce sent a second, updated draft to Ellestad. Joyce Decl., Ex. 5 [ECF No. 38-11]. Like the first draft, the second draft included a term requiring signed acceptance within 10 days. *Id.* § 11. That same day, Ellestad transmitted to Joyce by email a signed copy of the second draft that included a lengthy addendum with revisions. Joyce Decl., Ex. 6 [ECF No. 38-12]. Ellestad's proposed revisions effectively created a third draft of the letter of intent. Importantly, Ellestad's proposed revisions in this third draft included the addition of the following paragraph: "In the even[t] of a non-successful closing Supreme agrees to not solicit and no[t] hire [] AMEC employees for 24 months after the

conclusion of the LOI without written consent from AMEC CEO. The information available to Supreme could be damaging to AMEC." *Id.* [ECF No. 38-12 at 8]. Joyce responded that he would review Ellestad's changes and get back to him. Joyce Decl., Ex. 7 [ECF No. 38-13]. On July 30, Joyce emailed a fourth draft letter of intent to Ellestad. Joyce Decl., Ex. 8 [ECF No. 38-14]. The fourth draft incorporated many of the changes Ellestad proposed in the third draft but did not fully incorporate Ellestad's non-solicitation, non-hiring clause. Joyce's fourth draft provided only that Supreme Lending would not solicit AMEC employees for 24 months; Joyce did not incorporate Ellestad's proposed no-hiring clause. *Id.* § 1.b.ii. Joyce "specifically rejected Ellestad's limitation on 'hiring' AMEC employees" because he knew employees from other companies "frequently initiated contact with Supreme Lending," and he did not want to forbid Supreme Lending from hiring AMEC employees who initiated contact. Joyce Decl. ¶ 17. On August 3, Ellestad responded by email to the fourth draft letter of intent, stating "[h]ere is the signed LOI." Joyce Decl., Ex. 9 [ECF No. 38-15]. But it wasn't that simple. The letter of intent attached to Ellestad's email was not signed and included a handwritten edit reinserting the no-hire provision in the non-solicitation paragraph. *Id.* at § 1.b.ii. Ellestad's handwritten edit thus created a fifth draft letter of intent. Notably, all five drafts of the letter of intent included this provision:

> [E]xcept for the terms, provisions, and conditions of Paragraphs 6 (Confidentiality), 7 (Expenses and Fees), and 10 (Term and Termination) and this sentence, this LOI is not a binding agreement or contract and no binding legal agreement with respect to the subject matter of this LOI will arise until the execution by the parties of the Definitive Agreement.

3

Joyce Decl., Exs. 4–6, 8–9 at § 9. Each draft also required Ellestad to sign and return it to Supreme Lending. No further drafts of the letter of intent were exchanged or discussed.

In a letter dated January 17, 2020, Supreme Lending "withdr[ew] its offer to enter into an Asset Purchase Agreement with [AMEC] or to otherwise acquire the assets or to assume the liabilities of AMEC." Joyce Decl., Ex. 11 [ECF No. 38-17]. As an alternative to litigation over the failed negotiations, Supreme Lending offered AMEC a mutual release of claims "arising out of or relating to any conduct, event, occurrence, act, or failure to act by [Supreme Lending or AMEC] existing or occurring on or before January 17, 2020." *Id.*

AMEC and Supreme Lending have different explanations for why their relationship soured and why the acquisition ultimately never occurred. According to AMEC, during and after the Parties' letter of intent negotiations, Everett began disparaging Ellestad to AMEC employees. Harazin Decl. ¶ 4 [ECF No. 18]. AMEC says specifically that Everett told AMEC's president and chief operating officer, Jennifer Harazin, that she "could not trust Ellestad, [] that [she] was underpaid, manipulated, and misled," and that Everett "was going to fire Ellestad once the" acquisition was complete. *Id.* This disparagement assertedly led Harazin to resign from AMEC. *Id.* ¶ 5. After her resignation, Harazin received text messages from Everett soliciting her to join Supreme Lending. *Id.* ¶ 6–7. AMEC also says that, despite the Parties' agreement not to disclose the acquisition negotiations to AMEC employees, Supreme Lending did just that. Ellestad Decl. ¶¶ 10– 12. According to AMEC, Supreme Lending's assertedly improper disclosure prompted a second AMEC employee to resign. *Id.* ¶ 13. And in his declaration, Ellestad testifies that a third AMEC employee, Joe Kolesar, reported learning from various Supreme recruiters

4

that AMEC was being sold. *Id.* ¶¶ 14–15. Ellestad says he "immediately" reached out to Everett, who confirmed that Supreme Lending's chief strategy officer had leaked information regarding the acquisition negotiations to one of Supreme Lending's recruiters. *Id.* ¶ 17. According to Supreme Lending, the acquisition did not occur because "as Supreme Lending began investing the resources necessary to perform due diligence and finalize the deal, AMEC began to fall behind the pace and, ultimately, to engage in acts of outright stalling." Everett Decl. ¶ 7. Essentially, Supreme Lending began to suspect that AMEC was stalling "in order to use Supreme Lending's offer as a stalking horse and to improve [its] negotiating position with other potential buyers." *Id.* ¶ 9. Supreme Lending eventually gave AMEC a deadline by which it had to sign the acquisition agreement. *Id.* ¶ 10. When AMEC did not meet that deadline, Supreme Lending withdrew its offer. *Id.*

This is the second-filed case arising from the Parties' failed negotiations. Supreme Lending filed the first suit against AMEC in the District Court of Dallas County, Texas, on January 24, 2020. ECF No. 29. In that case, Supreme Lending asserts claims of fraud, negligent misrepresentation, promissory estoppel, and exemplary damages, alleging essentially that AMEC had no genuine intention of entering into an acquisition agreement. *Id.* AMEC filed this case in Minnesota District Court, Hennepin County, three days later, on January 27, and Supreme Lending removed the case to this Court on January 31. ECF Nos. 1, 2. AMEC asserts a single breach-of-contract claim, alleging that the Parties agreed to a letter of intent "[o]n or about July 30, 2019," and that Supreme Lending has and continues to breach the letter of intent by soliciting AMEC employees using information Supreme Lending "received during due diligence." *Id.* at ¶¶ 7, 34.

5

II[1]

AMEC characterizes its motion as one seeking a "temporary restraining order," Motion [ECF No. 13], but the motion does not comply with Federal Rule of Civil Procedure 65(b). Relevant here, Rule 65(b) provides:

> **(b) Temporary Restraining Order.**
>
> **(1)** *Issuing Without Notice*. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
>> **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>>
>> **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Here, with respect to the requirements in subparagraph (b)(1)(A), neither AMEC's affidavits nor its complaint address the need for an *ex parte* hearing. Regarding subparagraph (b)(1)(B), AMEC's counsel filed no certification describing why notice

---

[1] The Parties are diverse and the amount in controversy plausibly exceeds $75,000, so subject-matter jurisdiction exists under 28 U.S.C. § 1332. *See* Not. of Removal ¶¶ 5–6 [ECF No. 1]. Supreme Lending argues that personal jurisdiction is lacking because AMEC has yet to serve the summons and complaint. Mem. in Opp'n at 14 [ECF No. 33]. Supreme Lending does not seek dismissal on this basis (at least not yet); it acknowledges this omission "is easily curable" and argues only that "no preliminary injunction can issue" until service has occurred. *Id.* No doubt the threshold question of personal jurisdiction ordinarily must be resolved before the merits. Here, however, the denial of AMEC's motion resolves any concern Supreme Lending has about the issuance of an injunction absent service of process. For this reason, it would make little practical sense to stay consideration of AMEC's motion or delay its inevitable denial until service has occurred. Fed. R. Civ. P. 1.

should not be required.  For these reasons, AMEC's motion has been adjudicated—and will be decided—as a motion for a preliminary injunction.  *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 837–38 (D. Minn. 2011) (stating that because the defendants received notice and the motion for a temporary restraining order was fully briefed, "the Court will treat [the motion] as one for a preliminary injunction").

A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest."  *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112–14 (8th Cir. 1981) (en banc)).  The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113 (footnote omitted).  "The burden of establishing the four factors lies with the party seeking injunctive relief."  *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted). Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *CPI Card Grp.*, 294 F. Supp. 3d at 807. "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (citation omitted).

Under Minnesota law, "[t]o establish a breach-of-contract claim, a plaintiff must show that (1) a contract was formed; (2) the plaintiff performed any conditions precedent; and (3) the defendant breached the contract." *Ayala v. CyberPower Sys. (USA), Inc.*, 891 F.3d 1074, 1075 (8th Cir. 2018) (quoting *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006)).[2] "[T]he formation of a contract requires communication of a specific and definite offer, acceptance, and consideration." *Commercial Assocs., Inc.*, 712 N.W.2d at 782; *see also United States v. White*, 675 F.3d

---

[2] As noted, this case is in federal court based on diversity jurisdiction under 28 U.S.C. § 1332(a). Therefore, state substantive law applies to AMEC's breach-of-contract claim. *See Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). AMEC says Minnesota law applies but doesn't explain why. Supreme Lending "similarly assume[s] that Minnesota law applies," but also says it "reserves the right to argue that Texas law applies in other venues or contexts or to other claims, most notably the claims it has asserted in Texas state court." Mem. in Opp'n at 16 n.5. Based on the Parties' agreement, and because the record provides no information to determine independently whether Minnesota or some other state's law governs AMEC's claim, Minnesota law will be applied here. *See Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . . .").

1073, 1079 (8th Cir. 2012). Regarding acceptance, "[i]t is a settled rule of law [in Minnesota] that, in order to form a contract, an acceptance must be coextensive with the offer and may not introduce additional terms or conditions." *Podany v. Erickson*, 49 N.W.2d 193, 194 (Minn. 1951); *see also Commercial Assocs., Inc.*, 712 N.W.2d at 782. "An acceptance which qualifies the terms of the offer amounts in legal contemplation to a rejection of the offer and is regarded as merely a counteroffer." *Podany*, 49 N.W.2d at 194. Further, "[t]he long-standing rule in Minnesota is that 'where the parties make the reduction of the agreement to writing *and its signature by them* a condition precedent to its completion, it will not be a contract until that is done, and this is true although all the terms of the contract have been agreed upon.'" *Trautman v. JPMorgan Chase Bank*, No. A12-0300, 2012 WL 3263907, at *3 (Minn. Ct. App. Aug 13, 2012) (emphasis added) (quoting *Lamoreaux v. Weisman*, 161 N.W. 504, 506 (Minn. 1917)) (citing *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122–123 (Minn. 1980); *Massee v. Gibbs*, 210 N.W. 872, 873–74 (Minn. 1926); *TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 100 (Minn. Ct. App. 2004)).

Applying these long-standing Minnesota rules, the evidence at this preliminary stage shows that none of the letter-of-intent offers were accepted, and AMEC is therefore unlikely to succeed on the merits of its breach-of-contract claim. Each offered letter of intent included a provision entitled "Duration of this Offer." Joyce Decl., Exs. 4–6, 8–9 at § 11. This term was identical in each offer, and provided that the "LOI must be accepted *and a signed copy returned* to [Supreme Lending] on or before 5:00 PST within ten (10) days of the date of this LOI, unless extended in writing by mutual agreement." *Id.*

(emphasis added). In other words, the offer expired unless a signed copy was returned. Therefore, the first, second, fourth, and fifth draft letters of intent were not accepted because Ellestad did not sign them. *See* Joyce Decl., Exs. 4–5, 8–9; *Lamoreaux*, 161 N.W. at 506. Nor was the third draft letter of intent accepted because, although Ellestad signed it, he made significant changes to the letter of intent's terms in an attached addendum. Joyce Decl., Ex. 6. There is no suggestion by AMEC now, and there was no indication by Ellestad then, that the changes made by Ellestad were merely "requested or suggested modifications" or that Ellestad was clearly accepting the letter of intent regardless whether the changes were accepted by Supreme Lending. *See Podany*, 49 N.W.2d at 194. Though Ellestad never signed and returned a mirror image of the offer, AMEC argues that a contract was formed because there was a meeting of the minds between the Parties as to the fifth and final draft letter of intent. *See* Reply at 7–8 [ECF No. 40].[3] However, Minnesota law is clear that "[w]hen the parties make the reduction of the agreement to writing and its signature by them a condition precedent to its completion, it will not be a contract until that is done, and this is true although all the terms of the contract have been agreed upon." *Lamoreaux*, 161 N.W. at 506. Therefore, even if the Parties agreed on all terms in the fifth draft letter of intent, Minnesota law makes clear that this letter was not a contract because it required a signature but was not signed. *See* Joyce Decl., Ex. 9 at § 11.

---

[3] AMEC argued in its briefing and at the hearing on this motion that the Parties had a meeting of the minds on the fifth draft letter of intent. But in its complaint, AMEC relies on the fourth draft letter of intent. The non-solicitation provision referenced in the complaint differs from the non-solicitation provision in the fifth draft LOI in that the latter also includes a handwritten edit restricting Supreme Lending not merely from soliciting AMEC employees, but from hiring them. *Compare* Compl. ¶ 12, *with* Joyce Decl., Ex. 9.

Even if the Parties agreed to the fifth draft letter of intent, the non-solicitation provision is not binding or enforceable under the terms of that letter. Under Minnesota law, "[n]o contract is formed by the signing of an instrument when the offeree is aware that the offeror does not intend to be bound by the wording in the instrument." *Hamilton v. Boyce*, 48 N.W.2d 172, 174 (Minn. 1951). Further, "where the parties have agreed that an agreement to negotiate or letter of intent, in its entirety, is not a binding legal agreement, Minnesota courts have refused to enforce an individual provision of the letter as a freestanding contract promise." *Richie Co., LLP v. Lyndon Ins. Grp., Inc.*, 316 F.3d 758, 761 (8th Cir. 2003) (citation omitted). Here, § 9 of every version of the letter of intent provided that "except for the terms, provisions, and conditions of Paragraphs 6, . . . 7, . . . and 10 . . . and this sentence, this LOI is not a binding agreement or contract and no binding legal agreement with respect to the subject matter of this LOI will arise until the execution by the Parties of the" acquisition agreement. *See* Joyce Decl., Exs. 4–6, 8–9 at § 9. The inclusion of § 9 in each version of the letter of intent shows that Supreme Lending did not intend to be bound by § 1.b.ii, the non-solicitation provision. It follows from *Richie* that if parties may agree that the entirety of a letter of intent is unenforceable, they also may agree that certain parts of a letter of intent are unenforceable, and that is what § 9 does here. *See Huber & Sons, Inc. v. Serv. Corp. Int'l*, No. 01-cv-1583 (RHK/AJB), 2002 WL 1338036, at *5 (D. Minn. June 17, 2002) (declining to dismiss a breach of contract claim arising out of a specific provision of a letter of intent because, although the letter of intent stated it was not binding, it also provided that the specific provision at issue was legally binding and enforceable). Therefore, if the Parties did agree to the fifth draft letter of intent,

§ 9 is fatal to AMEC's breach-of-contract claim because it must be understood to say that the non-solicitation provision in § 1.b.ii is non-binding and unenforceable.

B

The second *Dataphase* factor is irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22 (citations omitted), "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation and internal quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction," and "[w]hen there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins Inc.*, 346 F.3d at 844 (citations omitted); *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

AMEC contends it will suffer irreparable harm because "[n]umerous cases have held that irreparable injury is generally inferred from the alleged breach of a valid restrictive covenant." Mem. in Supp. at 8 [ECF No. 14] (citing *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091 (D. Minn. 1981); *Eutectic Welding Alloys Corp. v. West*, 160

N.W.2d 566, 569 n.4 (Minn. 1968)). If this assertion remains a correct rule of law, it does not support the issuance of a preliminary injunction here because, as just explained, the restrictive covenant AMEC relies on is not valid. AMEC has not made "a clear showing of immediate irreparable injury" based on Supreme Lending's solicitation of AMEC employees. *Berkley Risk Adm'rs Co.*, 2016 WL 4472943, at *4.

If there were a valid restrictive covenant, AMEC has not shown it is likely to suffer irreparable harm in the absence of an injunction. The cases AMEC cites for the proposition that a violation of a restrictive covenant may cause irreparable harm do not focus solely on the breach of the covenant, but the effects of that breach. In *Benfield, Inc. v. Moline*, the plaintiffs were likely to suffer irreparable harm "in the form of lost good will, reputation, and business relationships" because former employees were allegedly breaching restrictive covenants in their employment contracts by soliciting the plaintiffs' business clients. 351 F. Supp. 2d 911, 918 (D. Minn. 2004). Similarly, in *Medtronic, Inc. v. Advanced Bionics Corp.*, the Minnesota Court of Appeals explained that "irreparable injury can be inferred from the breach of a restrictive covenant if [a] former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business." 630 N.W.2d 438, 452 (Minn. Ct. App. 2001) (citations omitted). In other words, irreparable injury isn't inferred merely from a restrictive covenant's breach, but from a breach "in a way which obtains a personal hold on the good will of the business." *Id.* AMEC has not shown here how Supreme Lending's solicitation of AMEC employees obtains a hold on AMEC's good will or business relationships. AMEC has not shown, for example, that particular employees have such a strong personal hold on the good will of

AMEC that recruitment of those employees inevitably would harm AMEC's reputation. Nor has AMEC introduced evidence tending to show that its clients, or some of them, are likely to follow recruited employees. It is not difficult to accept that AMEC might suffer financially depending on who among its employees Supreme Lending is able to recruit— perhaps from having to pay recruited employees more to keep them, perhaps from some decrease in revenues—but these amounts seem "'reparable' through money damages." *Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016).

C

The remaining two *Dataphase* factors do not change things. The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm other interested parties "would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015). Though AMEC has not shown it is likely to suffer irreparable harm in the absence of an injunction, Supreme Lending's ongoing recruitment of its employees poses, at least, challenges for AMEC. By comparison, Supreme Lending characterizes its loss if an injunction were entered as a denial of "the opportunity to improve its business." Mem. in Opp'n at 32. At least on this record, Supreme Lending's loss of this opportunity seems less harmful to it than the challenges its recruiting poses to AMEC. Supreme Lending also argues that an injunction would harm AMEC employees by limiting their employment opportunities, but that loss seems modest because the injunction AMEC seeks would not prevent its employees from seeking employment at Supreme Lending (or elsewhere). It would prevent only Supreme

Lending's recruitment of them.  Finally, the public interest seems insubstantial because this case implicates primarily business interests, *see Nilfisk, Inc. v. Liss*, No. 17-cv-1902 (WMW/FLN), 2017 WL 7370059, at *7 (D. Minn. June 15, 2017), and the record at this stage does not show that Supreme Lending's ability to solicit AMEC employees holds the potential to adversely affect competition in the mortgage lending industry, *see Gibbons*, 527 F. Supp. at 1095.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff's Motion for a Temporary Restraining Order [ECF No. 13] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 28, 2020  s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court